# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No. 2:12-00004 |
| v. | ) | |
| | ) | Judge Sharp |
| JERMAINE S. PHILLIPS | ) | |
| | ) | |

## MEMORANDUM

Pending before the Court is Defendant Jermaine Phillips' *Motion to Suppress Fruits of Execution of Search Warrant* and *Motion to Suppress Fruits of Traffic Stop* (Docket Entry Nos. 22 and 23). The parties have fully briefed the issues, and the Court held an evidentiary hearing on September 7, 2012.[1]

### I. FACTUAL BACKGROUND

Having reviewed the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be facts relevant to the pending motions. Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation those facts which it deems to be immaterial to the issues presented by Defendant's motions.

On November 18, 2010, Lieutenant Tommy Profitt ("Lt. Profitt"), Carthage Police Department, took a call from a concerned citizen, Tony Bingham ("Bingham"), who advised the officer that he had been at a cigarette store on Highway 25 where several people in a white van were going in and out of the store with several credit cards and that Bingham had overheard

---

[1] Post-hearing briefs were filed specifically addressing the initial stop and the alleged "prolonged" seizure by the officers. *See* (Docket Entry Nos. 40, 41 and 44).

"every one of them's coming up declined." (Docket Entry No. 40-1, Exhibit A, Dispatch Transcript at 2). Their conversation is set forth below.[2]

| | |
|---|---|
| CARTHAGE PD: | Carthage Police Department. |
| BINGHAM: | Yes. I was just at the cigarette store out there on Highway 25. |
| CARTHAGE PD: | Uh-huh. |
| BINGHAM: | And there's this white van out there with several colored people in it. |
| CARTHAGE PD: | Uh-huh. |
| BINGHAM: | And they're going in and out of the store with several credit cards, and every one of them's coming up declined. I just happened to overhear it. |
| CARTHAGE PD: | Okay. Thank you, sir. Is it still – |
| BINGHAM: | And – |
| CARTHAGE PD: | Is it still there now? |
| BINGHAM: | Yeah. You need to hurry, because I see them getting in the van. |
| CARTHAGE PD: | Can you get the tag number? |
| BINGHAM: | It's a – it's a Rhode Island tag number. If you'll hurry right now, you'll catch them. |
| CARTHAGE PD: | Well – |
| BINGHAM: | It's several – it's a white minivan. |
| CARTHAGE PD: | What's the tag number? |
| BINGHAM: | I don't – SZ-something. I – I don't want to – you know, I've done been seen. They see me. You know what I – |

---

[2] Lt. Profitt was acquainted with Bingham and recognized his voice on the phone. (Docket Entry No. 30, Suppression Hearing Transcript ("SH Trans.") at 9).

2

| | |
|---|---|
| CARTHAGE PD: | Which – |
| BINGHAM: | – mean? |
| CARTHAGE PD: | Which way are they going? |
| BINGHAM: | They're still in the parking lot. If you hurry, you'll get to them. It's a white – |
| CARTHAGE PD: | Okay. But just – but soon as I hang up the phone right there, it's going to take me at least three to five minutes to get out there to you. |
| BINGHAM: | Okay. Well, I asked the lady – I went back in and asked her was she okay, and she said yeah. But they're still there, and it's kind of fishy, you know. I meant, that was – |
| CARTHAGE PD: | But you can't see the – you can't see the – |
| BINGHAM: | The tag? |
| CARTHAGE PD: | Yeah. |
| BINGHAM: | No. It's S – SZ-something. I don't know what the last – I'll drive back by and look at it and tell you. |
| CARTHAGE PD: | And it's a white – it's a white minivan |
| BINGHAM: | It's a white – it's a white minivan with black, tinted windows, and it's a bunch of black people in it. I'm not prejudiced or anything. I'm – |
| CARTHAGE PD: | I know that. Well, all right, then. I'll get on my – I'll be on my way out there. |

(Dispatch Transcript at 2-4). There was no other communication between Bingham and Lt. Profitt.

Lt. Profitt arrived at the tobacco store approximately two minutes after receiving the call from Bingham. When Lt. Profitt arrived, he observed two vehicles – the one Bingham had described and a second maroon sedan – with individuals standing together between the two

3

vehicles conversing among themselves. Bingham was still in the vicinity when Lt. Profitt arrived, and Bingham pointed toward the two vehicles. Lt. Profitt sat in his vehicle watching the subjects standing between the two vehicles, and they looked "straight at [him]." (SH Trans. at 35). Lt. Profitt was in Carthage Police Department vehicle Unit 106. When the subjects saw Lt. Profitt, it was at that point that the subjects divided up, entered the two vehicles and left the tobacco store parking lot at the same time. These personal observances by Lt. Profitt led him to believe that the individuals were together. Subsequently, Lt. Profitt exited his vehicle and went to the door of the tobacco store where he briefly confirmed the information reported by Bingham with an employee of the store. This employee advised Lt. Profitt that the subjects were buying a lot of tobacco products using multiple credit cards/debit cards and when one card would not work, they would pull out another card, then another card. There were no other customers in the store at the time Lt. Profitt spoke with the employee. Lt. Profitt immediately returned to his vehicle. Due to the length of a traffic light near that location, the vehicles were still in sight when Lt. Profitt returned to his patrol car.

After returning to his patrol car, Lt. Profitt contacted his dispatcher and advised that there were two vehicles describing them as a white van with Rhode Island tag number SZ730 and a maroon car. He further advised the dispatcher that the subjects had gone into the store with "gift cards, credit cards, stuff like that" and that there was over $600 worth of "stuff." (Dispatch Transcript at 5). Lt. Profitt then asked the dispatcher to get in contact with the Smith County Sheriff Department ("SCSD") for assistance in stopping the vehicles. The dispatcher immediately switched over to the SCSD frequency and broadcasted a request for assistance in stopping individuals in a white van with Rhode Island tags and a maroon car who were

4

"evidently working in concert with each other" at a tobacco store in Carthage "going back and forth in" and trying "different credit cards to make purchases."

For about a mile, Lt. Profitt followed the two vehicles, which drove in a normal manner. He stopped the van. After investigating its three occupants, and after being told that they always use gift cards instead of cash when traveling, he let them go.

Sheriff Steve Hopper ("Sheriff Hopper"), SCSD, arrived on the scene and observed the white van and the maroon sedan matching the descriptions that had been broadcasted. Sheriff Hopper observed Lt. Profitt stop the white van, and Sheriff Hopper then stopped the maroon sedan. Deputy Ricky Mailer ("Deputy Mailer"), SCSD, was on the scene and a white van and maroon Gran Prix had been spotted at the intersection of Upper Ferry and Wal-Mart. Deputy Mailer requested an NCIC check on the two Massachusetts driver's license numbers of the occupants of the maroon car, which included Defendant. Law enforcement officers could see, in plain view, debit/credit cards scattered loose in the console and in the floorboard of the vehicle.

The ID check came back within ten or fifteen minutes. At that time, Sheriff Hopper learned that the female passenger Marquita Cappra ("Cappra") was wanted out of Texas. The SCSO confirmed that Texas would extradite, then requested Cappra to step out of the vehicle, and she was placed under arrest. A search was made of Cappra's person, and a small amount of marijuana was found on her person. After Cappra was arrested, Sheriff Hopper went back to Defendant, who was still in the vehicle, and he was asked whether he had any illegal substances or weapons on his person. Defendant indicated that he had some marijuana on him.

Detective Christopher Jenkins ("Detective Jenkins"), SCSD, arrived on the scene at about the time that Defendant was getting out of the vehicle and explaining to a deputy that he was in possession of a small amount of marijuana. Defendant then turned over a small amount of

marijuana to Deputy Mailer. Defendant was arrested for simple possession of marijuana, and Detective Jenkins requested and received consent from him to search the vehicle. Detective Jenkins participated in the search of the entire vehicle, which took place at the site of the stop. Detective Jenkins found illegal drugs, debit cards and gift cards, merchandise (including electronic devices, GPS, video games and clothing), as well as a laptop. Hidden in a compartment in the trunk, where the jack would normally go, were multiple credit card/debit card/gift card type of cards numbering 90 to a 100. After the search, within fifty-two minutes of the stop, Defendant and Cappra had been arrested and were being transported to the Smith County Sheriff's Office, and their vehicle was towed to an impound lot.

According to Detective Jenkins, had Defendant not consented, the vehicle would still have been searched incident to the arrest for marijuana to look for other evidence of narcotics violations. Additionally, pursuant to the SCSO standard operating procedure at the time, due to the fact that the vehicle was towed to an impound lot, an inventory search would have been conducted absent consent to inventory the possessions for the SCSO records, the tow company's records, and the records of the vehicle owner.

After discovery of the gift cards and learning that Defendant's passenger was wanted out of Texas on charges related to fraudulent use of cards, Detective Jenkins contacted members of the U.S. Secret Service when he learned that the Secret Service had a card reader and could assist with the investigation. On that same date, November 18, 2010, SA Thomas Riley ("SA Riley"), USSS, responded to Detective Jenkins' request for assistance. SA Riley used a credit card reader and determined that approximately 108 of the cards found in the vehicle driven by Defendant had been re-encoded, that is the embossed number on the front of the card did not match the magnetic stripe number imprinted on the back. A later investigation conducted with the banks

who issued the cards confirmed that they did not belong to Defendant or Cappra. After determining that the credit/debit cards had been re-encoded, SA Riley and SA Jeremy King, USSS, interviewed Defendant. SA Riley advised Defendant of his Miranda rights, and Defendant waived those rights and agreed to be interviewed by SA Riley.

Defendant denied knowledge of any of the items in the vehicle, including the laptop computer, merchandise and access devices. Upon learning that evidentiary items related to access device fraud had been left in the vehicle by local law enforcement officers, SA Riley asked Defendant for consent to do another search of the vehicle by Secret Service agents. Defendant consented to a search of the vehicle by Secret Service agents and to a search of his personal belongings. The search of the vehicle by Secret Service agents led to the seizure of additional genuine gift cards, re-encoded credit cards, computer equipment, Western Union receipts showing a destination of Romania, merchandise and merchandise receipts. The search of Defendant's personal belongings revealed two re-encoded Bank of America credit cards bearing Defendant's name, Jermaine Phillips.

Cappra also consented to be interviewed and admitted to using gift cards, which she received from Defendant to purchase merchandise and other gift cards. Cappra advised agents that she believed the laptop belonged to Defendant and that she personally had seen him access and use the laptop throughout the trip from Boston, Massachusetts. Cappra provided written consent to search her cell phones and provided an instant message or user name for Defendant of "MAINO0694."

On February 7, 2011, SA Riley sought a search warrant for the laptop and other computer equipment and cell phones discovered during the search of the vehicle on November 18, 2010.

The results of the forensic examination of the laptop computer conducted pursuant to the search warrant revealed the internet instant messenger name provided by Cappra, several e-mails addressed to Defendant, and nine text files containing approximately 1269 compromised credit/debit card account numbers. No information with evidentiary value was obtained from the other computer equipment and cell phones covered by the search warrant.

On May 16, 2012, a federal grand jury returned an Indictment charging Defendant with conspiracy and possession of 15 or more unauthorized access devices based upon the November 18, 2010, incident. (Docket Entry No. 17).

## II. ANALYSIS

Defendant contends that the police violated the Fourth Amendment by stopping and prolonging the stop on November 18, 2010. *See* (Docket Entry No. 40 at 19). Therefore, contending that the fruits of the violation should be suppressed. (*Id.* at 1). Specifically, Defendant seeks to suppress (1) the physical evidence and statements obtained in the course of the search and seizure of the vehicle he was driving on November 18, 2010, and (2) any evidence obtained during searches of the IBM laptop, Seagate external hard drive, and MP3 player, T-Mobile Sidekick phone, Mobile HTC G2 phone, and Verizon Samsung phone. *See* (Docket Entry Nos. 22 at 1 and 23 at 1).

The Government counters that Lt. Profitt's personal observances indicated that the individuals in the white van and maroon sedan were traveling together and acting in concert. (Docket Entry No. 41 at 11). Further, within ten or fifteen minutes of the stop, the computer check revealed an active warrant for Cappra leading to the rapid discovery of marijuana in the possession of Defendant and Cappra and probable cause for the arrests. In less than an hour, Defendant was being transported to the Smith County jail, having been arrested for simple

possession. (*Id*. at 16). Because there was no Fourth Amendment violation in this case, the Government contends Defendant's motions should be denied. *See* (*Id.*).[3]

**A. Reasonableness of Initial Stop**

The Fourth Amendment protects individuals from unreasonable searches and seizures and evidence that stems from unreasonable searches or seizures must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Traffic stops are seizures within the meaning of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). A defendant, as the proponent of a motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated, *see Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), but it is the government's burden to demonstrate by a preponderance of the evidence that a stop was constitutional. *See United States v. Winfrey,* 915 F.2d 212, 216 (6th Cir. 1990); *United States v. Smith,* 263 F.3d 571, 582 (6th Cir. 2001).

"Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause." *United States v. Alston,* 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Bueno,* 21 F.3d 120, 123 (6th Cir. 1994)).

---

[3] As to the IBM laptop, the Government asserts that Defendant does not have standing to contest the search of the laptop as he denied any ownership interest in the laptop at the time of his arrest. (citing *See United States v. Peters*, 194 F.3d 692, 696-97 (6th Cir. 1999); *United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991); *United States v. Knox*, 839 F.2d 285, 293-94 (6th Cir. 1988). *See* (Docket Entry No. 8, fn 4). The Court agrees. Second, the Government does not contest the remaining items (the Seagate external hard drive, MP3 player, T-Mobile Sidekick phone, Mobile HTC G2 phone, and Verizon Samsung phone) covered in the search warrant; consequently, the Court will grant Defendants' motion with respect to these items. *See* (Docket Entry No. 31 at 13 and SH Trans. at 5).

The stop of a vehicle and detention of its occupants is a seizure-a non-consensual, investigative detention-under the Fourth Amendment. *United States v. Gross,* 550 F.3d 578, 582 (6th Cir. 2008). If the initial traffic stop is unlawful, then the evidence obtained from that illegality must be excluded as "fruit of the poisonous tree." *Wong Sun,* 371 U.S. at 488.

The first relevant question here is whether Lt. Profitt had reasonable suspicion based upon specific and articulable facts to conduct the stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For reasonable suspicion "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

In order for an initial stop to be reasonable under the Fourth Amendment, the "officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The requirement for particularized suspicion has two elements: (1) the assessment of whether the officer had a particularized suspicion must be based on the totality of the circumstances and (2) the assessment must yield a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime. *Id.* at 418.

In the present case, Sheriff Hopper's initial stop of Defendant was reasonable under the totality of the circumstances. First, Bingham (whom Lt. Profitt was personally acquainted) witnessed and reported "[the individuals were] going in and out of the store with several credit cards, and every one of them's [sic] coming up declined." (Dispatch Transcript at 2). Second, Lt. Profitt observed the individuals (Defendant included) standing between the white van and

maroon sedan when he arrived on the scene – testifying further that Bingham "pointed [him] towards the vehicles that was [sic] in question." (SH Trans. at 10). Third, Lt. Profitt testified that he confirmed Bingham's report with store clerk. Fourth, when the individuals saw Lt. Profitt, they divided into the two vehicles. Thereafter, Lt. Profitt radioed for backup from the Smith County Sheriff's Department.

A reasonable officer with Lt. Profitt's background and experience[4] likely would have made the same assessment and would have tried to stop Defendant to confirm or dispel that suspicion. Although, Defendant attempts to scrutinize every singular action of the police, the totality of circumstances reveals that the officers were conducting an appropriate investigation, and were justified in their efforts to assess the situation. Accordingly, it is submitted that this gave rise to legitimate stop under *Terry*.[5]

**B. Reasonableness of Length of Stop**

Finally, Defendant suggests that even if the stop was valid, his Fourth Amendment rights were violated when the stop was impermissibly prolonged – and the evidence seized during this prolonged detention must be suppressed. (Docket Entry No. 40 at 18). Defendant contends "even if Lieutenant Profitt had a reasonable suspicion justifying the detention of Phillips for credit-card [sic] fraud, and even if Sheriff Hopper lawfully stopped Phillips so Profitt could talk

---

[4] Lt. Profitt had been with the Carthage Police Department for seven years, and he worked in another city department prior to that. (SH Trans. at 6).

[5] At the request and reliance of the South Carthage Police Department, Sheriff Hopper stopped Defendant's vehicle. It is well-established that an officer may conduct a stop based on information obtained by fellow officers. *United States v. Barnes,* 910 F.2d 1342, 1344 (6th Cir.1990) (citing *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Variously called the "collective knowledge" or "fellow officer" rule, this doctrine recognizes the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Hensley,* 469 U.S. at 231, 105 S.Ct. 675 (quotation omitted). Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion. *Dorsey v. Barber,* 517 F.3d 389, 396 (6th Cir. 2008); see also United States v. Lyons, 687 F.3d 754 (6th Cir. 2012).

to him, Sheriff Hopper wrongfully prolonged the stop because he prolonged it without ever contacting Profitt or otherwise learning the underlying reason for the stop." (*Id.* at 19).

Sheriff Hopper testified that since he had not had the opportunity to speak with Lt. Profitt, he initiated the stop "just like we normally would."[6] (SH Trans. at 60). Sheriff Hopper testified further that he "explained to [Defendant and Cappra] that we had stopped them based on assistance to Carthage Police Department. And from that point[7], then we asked for identification on both the driver and passenger." (Docket Entry No. 38 at 39). He then dispatched a warrant check on the occupants of the sedan. (*Id.*). The warrant check took "roughly ten minutes or so." (*Id.*).[8]

Defendant ensues to argue that "[Sheriff] Hopper detained Phillips for about ten or fifteen minutes before he developed any independent reason to suspect Phillips of criminal activity (i.e., learning that Phillips had marijuana in his pocket). The government bears the burden of justifying that ten-to fifteen-minute detention…" (Docket Entry No. 40 at 17).

In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop. *United States v. Bell,* 555 F.3d 535, 541 (6th Cir. 2009) (In the absence of reasonable suspicion, "all the officer's actions must be reasonably related in scope to circumstances justifying the original interference." (citing *United States v. Townsend,* 305 F.3d 537, 541 (6th Cir. 2002) (internal quotations omitted)). Requesting

---

[6] Citing to *United States v. Lyons*, 687 F. 3d 754, 767 (6th Cir. 2012), Defendant purports that the Government has failed to prove all three elements of the collective knowledge doctrine, specifically the first element, wherein "the officer taking the action must act in objective reliance on the information received." The Court respectfully disagrees in this instance.

[7] Within two minutes of initiating the stop, Sheriff Hopper or his backup called their dispatcher with the license numbers of Phillips and the passenger to conduct a check for warrants. (Docket Entry No. 41-1, Govt's Ex. 2, Dispatch Report).

[8] Ultimately, the warrant check revealed that there was a warrant on Cappra. Once Sheriff Hopper confirmed that Texas would extradite, Cappra was placed under arrest. A search was then conducted, and a small amount of marijuana was found on her person. Thereafter, Defendant advised he "had a little bit of marijuana on him." (Docket Entry No. 38 at 41-42).

a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the scope of a traffic stop for a speeding violation. *United States v. Hill,* 195 F.3d 258, 269 (6th Cir. 1999).

It is established law that a traffic stop must "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Perez,* 440 F.3d 363, 370 (6th Cir. 2006) ("Once the purpose of an ordinary traffic stop is completed, the officer may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" (quoting *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995)).

Sheriff Hopper was within his rights in requesting the driver's licenses of Defendant and his passenger – and subsequently, conducting a warrant check. Further, the Court finds that the approximately ten to fifteen minute detention while awaiting the warrant check was appropriate and not violative of Defendant's rights because it was justified as Sheriff Hopper conducted the stop "just like [he] normally would" and the identification check lasted no longer than was necessary to effectuate the purpose of the stop.

Consequently, suppression of evidence resulting from the lawful encounter on November 18, 2010, would be inappropriate.

### III. **CONCLUSION**

On the basis of the foregoing, Defendant Jermaine Phillips' *Motion to Suppress Fruits of Execution of Search Warrant* (Docket Entry No. 22) is hereby GRANTED as to any evidence obtained during the searches of the Seagate external hard drive, MP3 player, T-Mobile Sidekick phone, Mobile HTC G2 phone, and Verizon Samsung phone but DENIED with respect to the

IBM laptop. The *Motion to Suppress Fruits of Traffic Stop* (Docket Entry No. 23) is hereby DENIED.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE